UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| K&M KNIGHTS EXPRESS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) 4:22-CV-00015-DCLC-CHS |
| v. | ) |
| | ) |
| HULLETT'S SERVICE CENTER, LLC, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Hullett's Service Center, LLC's Motion for Summary Judgment [Doc. 49]. The motion is fully briefed and ripe for resolution. For the reasons that follow, Defendant's motion is **GRANTED**.

**I.     BACKGROUND**

Plaintiff K&M Knights Express, Inc. is a Georgia-based trucking company which transports freight nationwide [Doc. 6, ¶ 2; Doc. 51-3, pg. 11]. Plaintiff has two tractor trailer trucks which it uses exclusively to transport freight for FedEx [Doc. 51-3, pg. 11]. In April 2021, one of the trucks, a 2012 Volvo VNL670, broke down in the course of making a delivery to Nashville, Tennessee, and was towed to Defendant's nearby service center in Manchester, Tennessee [Doc. 6, ¶ 6; Doc. 51-3, pgs. 19, 24; Doc. 51-6, ¶ 7]. Defendant's mechanic, John Armstead ("Armstead"), testified that the truck "was in poor condition" when it came into the service center [Doc. 51-2]. He diagnosed the truck and concluded that it needed a new engine [*Id.* at pgs. 29–31]. Plaintiff's CFO Yowanda Knight ("Mrs. Knight") chose to install a used engine due to the cost difference compared to a new engine [Doc. 51-3, pg. 27].

1

Defendant purchased a used engine from NLI Sales, Inc. ("NLI") in Jasper, Alabama on May 15, 2021 to install in Plaintiff's truck [Doc. 51-4]. NLI provided a 30-day limited warranty for bends, breaks, or cracks in the block, head, rods, camshaft, and crank at the time of purchase [*Id.*]. However, the warranty expressly excluded the following: (1) oil leaks; (2) coolant leaks; (3) injectors; (4) fuel pumps; (5) turbo; (6) air compressor; (7) EGR cooler, wiring harnesses, sensors, sending units, or ECM box; (8) improper installation; (9) improper maintenance; (10) progressive damage from another source; or (11) labor or downtime [*Id.*]. NLI also recommended that the engine crank seals be replaced, that the rod and main bearings be checked or replaced as needed, that the block be inspected for any visible damage while the oil pan is off, that the oil pump be replaced, and that service bulletins or OEM updates be checked [*Id.*].

Armstead testified that NLI completed all of the recommended work before he picked up the engine. Specifically, he testified that NLI replaced the front and rear crank seals, removed the oil pan, installed new rods and main bearings, inspected the block, resealed the oil pan back up, and replaced the oil pump [Doc. 51-2, pgs. 38–41]. He further testified that when he got the engine from NLI "[i]t was already assembled with a flywheel housing" [*Id.* at pg. 87]. When he installed it in Plaintiff's truck, he attached the flywheel to the crank [*Id.*]. He also grinded or cut a portion of the frame to fit the engine within the frame [Doc. 55, ¶¶ 4, 5].

In addition to replacing the engine, Defendant informed Plaintiff that the clutch needed to be replaced [Doc. 51-3]. Armstead testified that he called the parts dealer, gave them the vehicle identification number ("VIN"), and they sent him a replacement clutch, which he installed [Doc. 51-2, pg. 59]. Although the replacement clutch was self-adjusting and the original clutch was manual, Armstead testified that it does not matter which type was installed [Doc. 51-2, pg. 63].

On June 8, 2021, Denorio Knight ("Mr. Knight"), Plaintiff's driver and Mrs. Knight's son, arrived to pick the truck up from Defendant's service center [Doc. 55, ¶ 7]. He testified that when

2

he pulled out of the parking lot in the truck, the clutch was "stiff" and he could not shift gears [Doc. 51-5, pg. 12]. He returned to Defendant's service center to ask about the clutch, and Armstead told him that he just needed to "find the sweet spot on the clutch to switch gears" [*Id*. at pg. 18]. By "find the sweet spot," Armstead explained during his deposition testimony, that "a new clutch works different than an old clutch" and the "clutch position is different," *i.e.*, the "clutch position is going to be down at the floor instead of halfway" and "there's a spot where you can't get it in gear" and "there's a spot at where you can when you depress the clutch" [Doc. 51-2, pgs. 15, 16]. After speaking with Armstead, Mr. Knight drove the truck back to Atlanta, Georgia and Plaintiff operated the truck from June 10, 2021 to June 14, 2021 [Doc. 55, ¶¶ 7, 8].

Thereafter, Plaintiff contacted Defendant regarding issues with the clutch. Mrs. Knight asserts that she had two different mechanics inspect the truck and perform repairs recommended by Armstead in an attempt to resolve the issues [Doc. 51-3, pgs. 35, 36]. Specifically, Armstead recommended that if Plaintiff was having problems shifting gears with the new clutch, the issue could be the slave cylinder or the synchronizer [Doc. 51-2, pgs. 66–71]. On June 18, 2021, Plaintiff took the truck to mechanic Bill Hough ("Hough") to check the synchronizer [Doc. 51-3, pg. 65], and on June 22, 2021, Plaintiff took the truck to Fong Truck and Trailer ("Fong") to have the slave cylinder replaced by Tremarcus Williams ("Williams") [*Id*. at pgs. 38, 65]. Neither of the recommended repairs resolved the issues, and both mechanics told Plaintiff that Defendant had installed the wrong clutch. Thus, Plaintiff had Williams install a new clutch and requested reimbursement from Defendant for the costs of the repairs, totaling approximately $7,000 [*Id*. at pg. 38]. While Defendant agreed to pay for the costs of replacing the clutch, it refused to pay for any costs associated with the synchronizer or slave cylinder [Doc. 51-6, pg. 9]. Defendant sent Plaintiff a check for the replacement clutch and labor, but Mrs. Knight refused to cash it because it did not cover the costs associated with the repairs suggested by Armstead [Doc. 51-3, pg. 36].

3

In addition to the issues with the clutch, Hough informed Plaintiff that, among other things, the flywheel housing was leaking oil, the motor mount bolt was not coming through the motor mount, and the frame had been cut [Docs. 56-1, 56-2]. Williams also noticed a "spot" on the frame that was "notched or cut out for the rear engine bell housing to fit properly" but he did not remember any oil leaking from the vehicle [Doc. 51-10, pgs. 12, 13]. Despite being notified of the foregoing issues with the truck, Plaintiff operated it for at least 119,988 miles from June 2021 to December 2021 [Doc. 55, ¶ 11]. During that time, the truck leaked oil continuously [*Id*. at ¶ 12]. Armstead testified that because the rear main seal was new, he did not think that was the source of the oil leak [Doc. 51-2, pgs. 54, 55]. Rather, he told Mrs. Knight over the phone that the oil leak was likely coming from the flywheel housing [*Id*. at pg. 52]. Rather than repair the oil leak, however, Plaintiff instructed its drivers to simply keep pouring oil in the truck [Doc. 55, ¶¶ 12–14].

On December 15, 2021, the truck broke down again in Atlanta [Doc. 51-3, pg. 58]. Plaintiff had the truck assessed by mechanic Jeff Simms ("Simms") at Smith Boys' Mobile who advised that the "engine was no good" [*Id*. at pg. 59]. Specifically, the invoice from Simms states, "Checked truck, it shut down on I-85 South, towed to yard, found the engine, crank won't spin over, the engine locked. Needs a used engine." [*Id*. at pg. 60]. In March 2022, Plaintiff got a second opinion from a different mechanic, Tony Douglas ("Douglas"), who said the same thing as Simms—the engine was locked up [*Id*. at pgs. 60, 61; Doc. 51-9, pg. 12]. Specifically, Douglas testified that the engine was seized up and he noticed a large amount of oil on the engine, "as if . . . the truck was moving at one point and leaking oil and it was blowing . . . to the back of the engine" [Doc. 51-9, pgs. 14, 15]. Although he does not know what the caused the engine failure or where the oil leak was coming from, Douglas testified that low oil pressure, issues with the high-pressure fuel pump or the compressor, a blown turbo, or lack of oil due to an oil leak could

4

cause the engine to seize up [Doc. 51-9, pgs. 27–30]. Douglas also testified that improper installation of the motor mounts could cause the bell housing on the engine to crack, which could cause an oil leak, but he did not know whether the bell housing in Plaintiff's truck was cracked [*Id*. at pgs. 31, 37]. With respect to the alteration of the frame, Douglas testified that cutting the frame was not standard, but "it would take more than a year" for the frame to crack [*Id*. at pg. 35].

Based on the foregoing, Plaintiff initiated this action against Defendant, alleging claims for negligent repair work, breach of contract, breach of implied warranty, and breach of express warranty [Doc. 6]. Plaintiff asserts that it lost the use of its truck as a result of Defendant's repair work and incurred damages, including losing a FedEx run contract and being forced to purchase a replacement truck, a 2016 Freightliner [Doc. 56, pg. 10]. Defendant now seeks summary judgment on each of Plaintiff's claims [Doc. 49].

## II. LEGAL STANDARD

Summary judgment is proper where "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed.R.Civ.P. 56(c)). The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citation omitted). A mere "scintilla of evidence" is not enough; the Court must determine whether, viewing the record in the light most favorable to the nonmoving party, a fair-minded jury could return a verdict in favor of the nonmoving party. *Id.* at 251–52; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.  DISCUSSION

Defendant primarily argues that it is entitled to summary judgment on each of Plaintiff's claims because Plaintiff cannot prove causation [Doc. 51, pgs. 10-19]. Causation is an essential element of Plaintiff's negligence, breach of contract, and breach of warranty claims. *See McClenahan v. Cooley*, 806 S.W.2d 767, 774 (Tenn. 1991) (negligence); *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (breach of contract); *Smith v. TimberPro Inc.*, No. W2018-00878-COA-R3-CV, 2019 WL 238113, at *5 (Tenn. Ct. App. Jan. 17, 2019) (breach of warranty). Causation is generally a question for the jury "unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." *McClenahan*, 806 S.W.2d at 775

Plaintiff alleges the following repair work by Defendant caused it to incur damages: (1) altering the frame of the truck; (2) installing a self-adjusting clutch rather than a manual clutch; (3) failing to reseal the engine prior to installing it to prevent oil leaks; and (4) improperly installing the motor mounts [Doc. 56, pgs. 14–15].

It is undisputed that Defendant's repair work involved altering the frame of the truck. However, Plaintiff has failed to produce any evidence that it incurred damages as a result of the alteration. Plaintiff alleges the alteration damaged the truck and rendered it unsafe to drive [Doc. 6, ¶ 34]. But the undisputed facts show that Plaintiff ran the truck for approximately six months and over 119,000 miles after the frame was altered, and there is no evidence in the record that the frame cracked or that it damaged the engine. Although Plaintiff alleges the alteration decreased the value of the truck, the only support in the record for that allegation is the testimony of Douglas that Plaintiff "may be able to sell [the truck] at a lesser value" and that he only had doubts as to whether a dealer would take it as a trade-in [Doc. 51-9, pg. 24]. Douglas, however, testified that he has no specialized experience in frame integrity [Doc. 51-9, pg. 33]. Likewise, Williams

6

testified that he would not personally cut a frame, but he could not provide a professional answer because he is "not a frame guy" [Doc. 51-10, pg. 16]. Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Plaintiff has failed to present any evidence beyond "metaphysical doubt" that the value of the truck was decreased due to Defendant's alteration of the frame.

As for the type of clutch installed, Plaintiff alleges it incurred additional costs to determine the cause of the clutch issues and to replace the self-adjusting clutch with a manual clutch. However, the record demonstrates that the truck operated with the clutch that Defendant installed. In fact, Plaintiff's driver was able to drive the truck from Manchester, Tennessee to Atlanta, Georgia on June 8, 2021, and Plaintiff operated the truck to deliver FedEx freight for five days after the driver returned the truck. Moreover, the testimony of Plaintiff's expert, Tom Ward, establishes that the clutch installed by Defendant functioned and, thus, it was not an *improper* clutch for the *truck* [Doc. 59-11, pg. 45]. Rather, it was simply not the type of clutch Plaintiff's driver was familiar with operating [*Id.*]. Even assuming that it was improper for Defendant to install the self-adjusting clutch, Defendant reimbursed Plaintiff for the cost of replacing the clutch, and Plaintiff chose not to cash the check.

Finally, Plaintiff has failed to establish any connection between Defendant's repair work and the engine failure in December 2021. As for the engine seals, Armstead testified that he personally watched NLI install the front and rear main seals and the engine was assembled with the flywheel housing, so he could not have installed the flywheel housing seal. When asked how he could have ensured that the flywheel housing was not leaking oil prior to installation, Armstead testified that the only way he could know is if he took the flywheel housing off and replaced the seal [Doc. 51-2, pg. 88]. Additionally, although one of Plaintiff's mechanics, Douglas, testified

7

that improper installation of the motor mounts could cause the bell housing on the engine to crack, which could cause an oil leak, Plaintiff has failed to put forth any facts showing that the bell housing on Plaintiff's engine was cracked. Even assuming Defendant failed to properly seal the engine and failed to properly install the motor mounts, Plaintiff has failed to put forth any facts showing that such failures caused the breakdown of the engine. Rather, the record is clear that no one, not even Plaintiff's expert, knows why the engine seized up in December 2021.

In sum, Plaintiff has failed to demonstrate that any actions or inactions by Defendant caused it any damage, including but not limited to loss of its truck and consequential damages, such as losing a FedEx contract. Rather, the undisputed facts demonstrate that Plaintiff ran the truck over 119,000 miles for six months after Defendant's repair work, despite knowledge of an existing oil leak. Based on the facts in the record before the Court, no reasonable jury could find in favor of Plaintiff on the issue of causation. As a result, Defendant is entitled to summary judgment on each of Plaintiff's claims.

### IV. CONCLUSION

Accordingly, for the reasons stated herein, Defendant's Motion for Summary Judgment [Doc. 49] is **GRANTED**. All other pending motions in this action are **DENIED AS MOOT**. A separate judgment shall enter.

    **SO ORDERED:**

                                                s/Clifton L. Corker
                                                United States District Judge